## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| TIMOTHY JOHN WISEMAN, | CASE NO. 5:22-CV-02216-DCN |
| Plaintiff, | JUDGE DONALD C. NUGENT |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Timothy Wiseman challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On December 8, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Dec. 8, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings consistent with this recommendation.

### PROCEDURAL BACKGROUND

Mr. Wiseman filed for DIB on August 28, 2020, alleging a disability onset date of June 16, 2020. (Tr. 165). The claim was denied initially and on reconsideration. (Tr. 85-90, 92-98). He then requested a hearing before an Administrative Law Judge. (Tr. 118-19). Mr. Wiseman (represented

by counsel) and a vocational expert (VE) testified before the ALJ on August 3, 2021. (Tr. 40-77). On October 15, 2020, the ALJ issued a written decision finding Mr. Wiseman not disabled. (Tr. 21-39). The Appeals Council denied Mr. Wiseman's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-8; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Wiseman timely filed this action on December 8, 2022. (ECF #1).

FACTUAL BACKGROUND

I.     PERSONAL AND VOCATIONAL EVIDENCE

Mr. Wiseman was 45 years old on the alleged onset date, and 46 years old at the administrative hearing. (Tr. 85). He graduated from high school and last worked as a creative director for a web agency. (Tr. 49, 70).

II.     PRE-ADMINISTRATIVE HEARING STATEMENTS

Mr. Wiseman completed an Adult Function Report to explain how his conditions limit his activities in October 2020, about one year before the administrative hearing. (Tr. 188-94). He endorsed fatigue and chronic pain in his head, neck, shoulders, hands, low back, and hips. (Tr. 188). On some days, the pain is so intense that he spends the entire day just managing the pain. (*Id*.). He noted difficulty with fine motor and "more active" motor tasks and sitting or standing for prolonged periods of time. (*Id*.).

His typical day starts with a shower to loosen his joints and reduce his pain and discomfort. (Tr. 189). He then tries to complete a few tasks but "things start to digress quickly" around lunch time and he spends the rest of his day restlessly managing his pain. (*Id*.). He endorsed sleeping just three to four hours a night due to pain. (*Id*.).

Mr. Wiseman reported being able to cook a small meal once or twice a month, wash dishes a few times a week, do light surface cleaning, do small repairs, and occasionally do laundry. (Tr. 190). He could go to the pharmacy and pick up a few groceries about one to three times a month. (Tr. 191).

Mr. Wiseman enjoys reading, listening to audiobooks, and watching documentaries but finds it difficult to stay focused for more than one to three hours at a time. He occasionally communicates with family and friends by phone and attends one or two events with family each month but does not go anywhere regularly because his conditions make going out difficult. (Tr. 192). At times, Mr. Wiseman's pain makes him irritable and causes him to react poorly or harshly when interacting with others. (*Id.*).

Mr. Wiseman reported that his conditions affect his memory and his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, concentrate, and use his hands. (Tr. 193). He can walk for a half-mile before needing a five- to ten-minute break. (*Id.*). He does not handle stress well. (Tr. 194).

III.   ADMINISTRATIVE HEARING

At the administrative hearing, Mr. Wiseman provided updated information about how his conditions affect him.

Mr. Wiseman lives with his wife and three daughters, ages 6, 10, and 12. (Tr. 49). He lost his job as creative director of a web agency in April 2020 due to the pandemic. (Tr. 50). He cannot return to work because of the discomfort he felt in his hands, neck, and back from sitting in front of a computer screen. (Tr. 50). He described disrupted sleep due to pain, fatigue and nausea, brain fog, and memory loss. (Tr. 51). He suffers from frequent headaches and has pain in his neck,

3

upper back, low-to-mid back, elbows, the joints of his hands, and shoulders, and numbness and tingling in his feet. (Tr. 52). He has venous insufficiency that causes burning pain, pressure, and swelling in his feet and ankles, and varicose veins. (Tr. 60). He also experiences dizziness accompanied by nausea and occasional vomiting. (Tr. 63). He had recent surgery to remove testicular cancer but denies any medical issues stemming from the condition. (Tr. 56).

Mr. Wiseman broke the pinky finger of his right hand in November 2020 and continues to have issues with it; for instance, he struggles to use a computer mouse because it causes discomfort in his hand after fifteen or twenty minutes. (Tr. 58-59). Tightening screws on a door or wall and using lip balm are the kinds of movements that cause a lot of aches, pains, discomfort, and shooting pains into his wrist. (Tr. 59).

Mr. Wiseman has dizziness and accompanying nausea with sudden head movements and exertion. (Tr. 63). The symptoms used to occur a few times a week until eight weeks before the hearing when they became constant. (Tr. 64-65). The symptoms also set in when he scrolls on a computer screen. (Tr. 63). He finds it easier to watch television because he is further from the screen. (Tr. 63). In addition, he recently underwent laser treatment and cryotherapy for a detached retina. (Tr. 66). Despite treatment, he still sees spots and floaters. (Tr. 67). His doctors will discuss additional treatment if the condition does not resolve within six months. (Tr. 66-67). Mr. Wiseman's wife drives him to his medical appointments. (Tr. 66).

Mr. Wiseman can stand or walk for about thirty minutes before needing to rest because of the aching pressure in his legs and the pain in his low back, right knee, and bilateral feet and toes. (Tr. 52). He can sit in an upright chair for about thirty minutes before needing to sit in a more comfortable chair or walk around for a few minutes. (Tr. 53). Because of the pain in his right leg,

Mr. Wiseman tries to walk around for fifteen minutes every hour. (Tr. 53). On a typical day, Mr. Wiseman wakes, showers, eats breakfast, and is off his feet for the rest of the day, except to get up and walk around. (Tr. 54). He is fatigued and sleepy during the day and frequently naps. (Tr. 53, 58). Standing and sitting for prolonged periods cause blood flow issues, so he elevates his legs several hours each day for relief. (Tr. 60). He can no longer cook, do dishes, clean, perform small repairs, or do laundry. (Tr. 54-55). Memory issues, brain fog, and managing his pain on a day-to-day basis contribute to his inability to help manage the household. (Tr. 62). It has affected his abilities to focus, retain information, and concentrate. (Tr. 62). Beginning about a year before the administrative hearing, Mr. Wiseman was unable to attend a considerable amount of his children's activities; now he misses most if not all of them. (Tr. 61-62).

For pain, Mr. Wiseman uses medical marijuana, ibuprofen, and Cymbalta, a medication also prescribed to treat his anxiety and depression. (Tr. 49-50). He takes methotrexate each Friday and remains in bed from Friday night to Sunday afternoon because the medication causes lots of fatigue and nausea. (Tr. 59). The medications are 50% to 80% effective at relieving his pain, and become more effective when he is not doing anything. (Tr. 52). Cymbalta has also helped Mr. Wiseman's anxiety and depression. (Tr. 54).

VE Gail Franklin identified Mr. Wiseman's past relevant work as creative director (DOT 141.067-010, sedentary, SVP 8). (Tr. 70). The ALJ asked if a hypothetical individual of Mr. Wiseman's age, education, and experience could perform that work if restricted to light work and limited as follows: can lift, carry, push, and pull twenty pounds occasionally, ten pounds frequently; sit for six hours and stand/walk for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; frequently balance, kneel, and

crouch; occasionally stoop and crawl; occasionally reach overhead bilaterally; must avoid concentrated exposure to temperature extremes, wetness, and humidity; avoid workplace hazards such as unprotected heights, exposure to dangerous machinery, or commercial driving; is limited to simple, routine tasks that do not involve arbitration, negotiation, or confrontation; must avoid positions involving directing others or being responsible for the safety or welfare of others; cannot perform assembly line work; is limited to occasional interaction with others; and must be in a workplace where changes are gradual and explained in advance. (Tr. 70-71). Ms. Franklin responded such an individual could not perform work as a creative director but identified other light jobs, including shipping and receiving clerk (DOT 222.387-074; SVP 2; 29,000 positions nationally), baker helper (DOT 524.687-022; SVP 2; 43,000 positions nationally), and mailroom clerk (DOT 209.687-026; SVP 2; 75,000 positions nationally). (Tr. 71-72). There are no jobs available for an individual who needs to elevate his legs to waist level twice a day for one hour at a time outside of regular breaks. (Tr. 73). An individual is equally precluded from competitive employment if he requires the ability to lie down for fifteen minutes twice a day outside of regular work breaks. (Tr. 74).

The VE testified that employers tolerate an employee being off task for no more than 10% of the workday and absent from work no more than once a month. (Tr. 72-73).

## IV. RELEVANT MEDICAL EVIDENCE

Mr. Wiseman has a history of low back and neck pain. In 2019, imaging revealed small endplate osteophytes at multiple levels of the lumbar spine and mild joint space loss at the bilateral hips, mild disc narrowing and endplate spurring at C5-C6 and C6-C7 with mild decreased diffuse osseous demineralization, and diffuse disc-osteophytic bulge at C6-C7. (Tr. 542, 546, 569). A

thoracic MRI revealed no evidence of stenosis or myelopathy and a brain MRI was negative for demyelinating disease or other pathology. (Tr. 541, 543).

Mr. Wiseman sees rheumatologist Howard Smith, M.D., for treatment of psoriatic arthritis. On January 13, 2020, Mr. Wiseman met with Dr. Smith and stated he is "relatively stable" and doing well on methotrexate. (Tr. 294). He attributed some of the pain relief in his hands, knees, shoulders, and ankles to medical marijuana. (*Id.*). Mr. Wiseman endorsed pain in the hands, morning stiffness for about fifteen minutes, occasionally swollen knees and proximal interphalangeal joints (PIP), afternoon fatigue, sleep difficulties from pain in the shoulders and neck, dry mouth, and some numbness and weakness in the hands improved with gabapentin. (*Id.*). He denied side effects from methotrexate. (*Id.*). Otherwise, Mr. Wiseman reported headaches, dizziness, nausea, and back pain. (Tr. 295-96). Physical examination was normal. (Tr. 297).

On January 28, 2020, Mr. Wiseman met with a family physician and endorsed symptoms indicating mild anxiety. (Tr. 239). Past medical history is notable for essential hypertension, psoriatic arthritis, attention deficit disorder (ADD), and chronic pain syndrome. (Tr. 240-41).

On July 14, 2020, Mr. Wiseman had a telehealth appointment with Dr. Howard. (Tr. 276). Mr. Wiseman reported stable psoriatic arthritis without complaints and endorsed the effectiveness of methotrexate without side effects. (Tr. 276-77). Otherwise, Mr. Wiseman denied morning stiffness and joint swelling and described sleeping through the night. (Tr. 277).

On August 24, 2020, Mr. Wiseman met with Nagy Mekhail, M.D., for pain management. (Tr. 271). There, he described chronic neck pain and the placement of Harrington rods during childhood to stabilize thoracic scoliosis. (Tr. 272). He endorsed persistent symptoms, including severe, shooting, and stabbing posterior neck pain radiating to the back of the head and

occasionally down to the shoulders, rated 7/10 currently and ranging between 5/10 and 10/10. (Tr. 272). He claimed the pain interfered with sleep and was exacerbated by physical activity and lifting and mitigated by heat, occasional naproxen, and a half dose of Percocet per day. (*Id.*). He denied having issues gripping objects with his hands and did not have radicular pain. (*Id.*).

Dr. Mekhail reviewed cervical imaging and found no evidence of acute fracture but did note a possible muscle spasm. (Tr. 273). Physical examination of the neck revealed limited range of motion with right lateral movement and flexion and pain with cervical facet loading (greater on the right than left). (Tr. 274). Dr. Mekhail also noted Mr. Wiseman's right shoulder was more elevated than the left. (*Id.*). Dr. Mekhail diagnosed cervical spondylosis without myelopathy or radiculopathy. (Tr. 275). The doctor felt Mr. Wiseman's neck pain was likely due to arthritis/facetogenic pain in the cervical facet joints; he planned to schedule a right cervical facet medial branch nerve block for diagnostic purposes. (*Id.*). On September 16, 2020, Mr. Wiseman received the cervical nerve block and endorsed pain relief, rating post-procedure pain at 3/10. (Tr. 666). On September 24, 2020, Mr. Wiseman endorsed 75% pain relief after the procedure and reported sleeping better. (Tr. 608).

On October 28, 2020, Mr. Wiseman returned for a second right cervical nerve block. (Tr. 605). There, he endorsed aching pain at the right posterior neck radiating to the shoulder. (*Id.*). He was scheduled for a radiofrequency ablation procedure in the same area. (Tr. 606).

On October 30, 2020, Mr. Wiseman underwent an open reduction and internal fixation procedure on his right pinky finger. (Tr. 677). He was released from occupational therapy for his hand on December 17, 2020. (Tr. 704).

On November 13, 2020, Mr. Wiseman endorsed 80% relief of neck pain lasting for one week after the second cervical nerve block. (Tr. 604). On December 2, 2020, Mr. Wiseman underwent radiofrequency ablation (RFA) to the right cervical facet medial branch nerve and rated post-procedure pain at 1/10. (Tr. 601, 603). On January 4, 2021, Mr. Wiseman endorsed 90% pain relief after the RFA procedure, sleeping better, and having fewer headaches. (Tr. 597).

On January 22, 2021, Mr. Wiseman established care with certified nurse practitioner Lindsey Foradis. (Tr. 593). He reported back pain, joint pain, neck pain, tingling, short- and long-term memory loss, and insomnia. (Tr. 595). Physical examination was normal. (*Id.*).

On February 24, 2021, Mr. Wiseman returned to Dr. Mekhail with left-sided, sharp posterior neck pain, rated 7/10, worse with rotation and extension of the neck. (Tr. 672). He received a left-side cervical facet steroid injection and rated his post-procedure pain at 2/10. (Tr. 673). Dr. Mekhail scheduled Mr. Wiseman for a left cervical RFA procedure. (*Id.*).

When Mr. Wiseman saw NP Foradis on February 25, 2021, he complained of daily sharp and throbbing right calf pain. (Tr. 824). He reported it hurt to walk and stated he was limping by day's end. (*Id.*). Mr. Wiseman endorsed painful varicose veins, fatigue/malaise, chronic night sweats, intermittent tinnitus, back pain, neck pain, joint pain, myalgias, facial tingling, tremors, sensory changes and weakness, memory loss, anxiety, and insomnia. (Tr. 824-25). On physical examination, NP Foradis noted a palpable, tender knot of varicose veins. (Tr. 826). NP Foradis referred Mr. Wiseman to a neurologist for evaluation of face tingling and neuropathy, and to the vein center for his varicose veins. (Tr. 827-28).

On March 1, 2021, Mr. Wiseman endorsed 85-90% pain relief with the left cervical facet injection and reported he could turn his head more and sleep better. (Tr. 822).

On March 5, 2021, Mr. Wiseman met with Matthew C. Rainey, M.D., for evaluation of varicose veins. (Tr. 819). There, he reported walking regularly and using elevation to address his right leg pain and swelling and endorsed significant aching and throbbing pain with prolonged periods of standing and activity. (*Id.*). Physical examination revealed varicose veins in the lower right leg and mild swelling at the ankle and foot. (Tr. 820). Ultrasound examination showed reflux in the right greater saphenous vein and posterior accessory greater saphenous vein, extending to the saphenofemoral junction. (*Id.*). He received compression stockings and was ordered to return for repeat evaluation; if the compression stockings failed to alleviate his symptoms, Dr. Rainey intended to perform endovenous laser ablation therapy on the right greater saphenous vein, sclerotherapy of the posterior accessory greater saphenous vein, and ambulatory phlebectomy of any residual varicosities. (*Id.*).

On March 24, 2021, Mr. Wiseman underwent a left cervical RFA procedure that increased his pain from 6.5 before treatment to 8/10 after the procedure. (Tr. 816-17). Several days later, he continued to complain of a burning sensation in the neck. (Tr. 814). On April 7, 2021, Mr. Wiseman denied any improvement since the procedure and endorsed continued burning neck pain that spread to the left trapezius area, with numbness and itching. (Tr. 815).

On April 14, 2021, Mr. Wiseman returned to Dr. Mekhail's office and endorsed sensitivity and a "sunburn" pain in his left upper shoulder, neck, and trapezius area since the RFA procedure. (Tr. 812). On physical examination, Mr. Wiseman had good range of motion in the neck with tenderness to palpation of the bilateral occipital nerves, left greater than right, and tenderness to palpation of the left trapezius area. (Tr. 813). Mr. Wiseman received Naprosyn and Dr. Mekhail scheduled occipital nerve blocks and trigger point injections. (Tr. 814).

10

On April 19, 2021, Mr. Wiseman was evaluated for participation in a pain program at the Center for Comprehensive Pain Recovery. There, he complained of pain in his neck, back, hands, and knees. (Tr. 807). He described the neck pain as radiating up to his head in the occipital region with intermittent facial tingling and numbness. (*Id.*). He also described continued left scapular burning pain since the most recent RFA procedure. (*Id.*). Mr. Wiseman identified lifting, stair climbing, yard work, physical activity, home chores, walking, and being too sedentary as aggravating his pain; methotrexate, pacing his activity, heat, ice, showers, rest, and relaxation as helping mitigate his pain. (*Id.*). He spends less than twelve hours in a reclined position and endorsed sleeping just five to six hours a night, night sweats, fatigue, changes in vision, tinnitus, heat intolerance and excessive thirst, back pain, joint swelling and stiffness, muscle pain, memory problems, headaches, numbness and tingling, depression, anxiety, and irritability. (Tr. 807-09). Mental status examination revealed a depressed affect, some tangential speech, good insight and judgment, and normal attention span and concentration. (Tr. 810-11). On physical examination, Mr. Wiseman appeared both pleasant and depressed and had pain at the cervical and thoracic paraspinal muscles, limited and painful lumbar and cervical ranges of motion in all directions, normal muscle bulk and tone, normal sensory and motor testing, and normal gait and reflexes. (Tr. 811). The evaluator recommended participation in the Chronic Pain Neuro-Rehabilitation Program and prescribed Cymbalta. (*Id.*).

On April 28, 2021, Mr. Wiseman returned to Dr. Mekhail's office for occipital nerve blocks. (Tr. 805). There, Mr. Wiseman described pain in the back of his neck that radiated to his temples bilaterally, rated 5/10. (*Id.*). After receiving the occipital injections, he denied improvement and rated his pain at 5/10. (Tr. 806).

11

On May 3, 2021, Mr. Wiseman attended a sleep disorder clinic for evaluation. (Tr. 801). He described difficulty falling asleep due to discomfort, pain, and constant thoughts, and waking up three to five times a night due to pain or night sweats. (*Id.*). He endorsed excessive fatigue and difficulty with memory and concentration. (Tr. 802).

On May 21, 2021, Mr. Wiseman returned to his rheumatologist and described constant maintenance of his joint pain using medical marijuana and Cymbalta. (Tr. 797-98). He endorsed fatigue and brain fog, but determined his symptoms were easier to manage after being laid off work. (Tr. 798). Mr. Wiseman felt his pain was related to the weather and his activity level, but he has pain to some degree on most days, typically in his hands and shoulders. (*Id.*). His worst pain comes in the evening, with swelling in the hands and knees when he is active. (*Id.*). Mr. Wiseman endorsed fatigue and nausea with methotrexate and described splitting the medication into two doses on Fridays, resulting in less fatigue on Saturdays, though the nausea remained. (*Id.*). Physical examination was notable for tenderness in the distal interphalangeal (DIP) joints, greater than the PIPs, and greater than the metacarpophalangeal (MCP) joints. (Tr. 799). Otherwise, Mr. Wiseman displayed full range of motion, normal gait, good strength, and grossly intact sensation. (*Id.*). Mr. Wiseman received a referral to an endocrinologist to evaluate his night sweats. (*Id.*).

On May 26, 2021, Mr. Wiseman attended a telehealth appointment with NP Foradis and endorsed feeling well without fatigue, could concentrate and focus, and denied headaches, neck pain, swollen or painful joints, and muscle aches. (Tr. 793-95).

During a June 15, 2021, appointment with Scott Pendergast, M.D., Mr. Wiseman described flashes and floaters in both eyes, greater on the right, associated eye pain, dizziness, and decreased vision for three to five days. (Tr. 733). He also endorsed fatigue, heat and cold

intolerance, and nausea. (*Id.*). After examination, Dr. Pendergast diagnosed a right eye horseshoe tear of the retina without detachment, posterior vitreous detachment, and high myopia bilaterally. (Tr. 734). Dr. Pendergast treated the tear with a barricade laser. (*Id.*). Mr. Wiseman returned to Dr. Pendergast's office on June 22 and complained of constant floaters, dizziness, nausea, fatigue, and cold and heat intolerance. (Tr. 730). On examination, Dr. Pendergast noted the barricade laser did not resolve the horseshoe tear and localized retina detachment and proceeded with cryopexy to achieve better scarring and adhesion of the retina. (Tr. 731-32).

That same day, Mr. Wiseman met with endocrinologist Yassin Mustafa, M.D., for evaluation of excessive sweating, high serum glucose, and thyroid concerns. (Tr. 782). He endorsed sweating, fatigue/malaise, nausea, back and joint pain, tingling, tremors, headaches, depression, anxiety, and insomnia. (*Id.*).

On June 23, 2021, Mr. Wiseman attended a follow-up telehealth visit with the Center for Comprehensive Pain Recovery and described ongoing pain and feeling overwhelmed after numerous medical appointments. (Tr. 778). He endorsed night sweats, intermittent dizziness becoming more persistent, associated nausea, floaters and flashes in the eyes, and variable neck pain since the most recent RFA procedure. (Tr. 778-81). Mr. Wiseman felt Cymbalta worked to improve his neuropathic pain and depression; he was open to increasing the dosage. (Tr. 778). Otherwise, he denied adverse effects of medication, including problems with cognition, alertness, bowel function, coordination, and motor function. (Tr. 780). Mental status examination revealed a depressed and anxious affect, mild somatic preoccupation, good insight and judgment, and normal attention span and concentration. (Tr. 781). He received an increased dose of Cymbalta. (*Id.*).

13

On June 25, 2021, Mr. Wiseman presented at the emergency department with dizziness and associated nausea. (Tr. 774). He noted that "sometimes" the dizziness was worse with movement and at other times, movement does not make a difference in the intensity. (*Id.*). He also described an uncomfortable feeling in his chest, occasional burning pain to his left shoulder and arm, and headache pressure worse on the right. (*Id.*). The treating provider felt his symptoms were consistent with vertiginous symptoms and administered meclizine and fluids. (Tr. 777). Mr. Wiseman was released after his symptoms improved. (*Id.*).

On June 30, 2021, Mr. Wiseman followed up with NP Foradis and complained of continued dizziness and nausea, claiming the medication he received at the emergency department made him feel drowsy and worsened the symptoms. (Tr. 766). Mr. Wiseman clarified that his dizziness is not a "room spinning sensation," but an issue with eye tracking and moving his head in certain directions. (*Id.*). He indicated that increased activity and brighter lights make worsen the dizziness. (*Id.*). Mr. Wiseman endorsed other symptoms, including loss of balance, near-syncope, visual change, auditory change, sweating, nausea, and shortness of breath. (Tr. 767). On physical examination, Mr. Wiseman complained of dizziness with extraocular eye movements. (Tr. 769). Mr. Wiseman received anti-nausea medication and a referral to consult with a physical therapist. (Tr. 770).

That same day, Mr. Wiseman attended another eye appointment with Thomas Tsai, M.D., and complained of blurred vision, floaters, and inconsistent flashes in the right eye, as well as fatigue, cold and heat intolerance, nausea, and dizziness. (Tr. 726). Dr. Tsai noted the localized retinal detachment, horseshoe tear of the retina, vitreous hemorrhage, posterior vitreous detachment, and high myopia; he recommended observation. (Tr. 727-28).

14

On July 6, 2021, Mr. Wiseman met with neurologist James Gebel, M.D., for evaluation of facial numbness with twinges or fasciculations, dizziness, and nausea. (Tr. 758). Examination revealed intact naming and repetition abilities, normal attention span and concentration, normal short-term memory, reflexes rated as 3+ and exaggerated throughout, and normal gait. (Tr. 761). Noting that Mr. Wiseman's dizziness did not respond to Ativan or meclizine, Dr. Gebel ordered a magnetic resonance angiography of the neck and brain to investigate. (*Id.*).

On July 7, 2021, Mr. Wiseman met with Sara Davin, Psy.D., for a psychological evaluation. (Tr. 751-52). There, he complained of chronic pain in the neck, back, hands, and knees, and dizziness and nausea, and stated his pain impacted his mood and made him feel like "nothing ever ends." (Tr. 752-53). He described not working in the past year due to pain and feeling frustrated by his inability to play with his children or engage in household or social activities. (Tr. 754). Mr. Wiseman endorsed a positive response to Cymbalta, stating that he processes his feelings more effectively. (*Id.*). Even with medication, he experiences emotional symptoms including frustration, irritability, worry, and grief and anxiety related to his medical problems. (*Id.*). Additionally, he described persistent fatigue, nausea, and disrupted sleep due to pain and night sweats. (*Id.*). Mental status evaluation revealed a depressed and anxious affect with marked somatic preoccupation. (Tr. 756). Dr. Davin diagnosed generalized anxiety disorder, depression, pain disorder with psychological and physical features, and chronic pain. (Tr. 757). She recommended participation in the Chronic Pain Neuro-Rehabilitation Program. (*Id.*).

On July 8, 2021, ophthalmologist Nicole Bajic, M.D., evaluated Mr. Wiseman and agreed that his eye issues are not the source of his dizziness. (Tr. 751).

The results of Mr. Wiseman's brain MRI were normal. (Tr. 749).

On July 9, 2021, Mr. Wiseman underwent endovenous laser therapy on the greater saphenous vein of the right leg. (Tr. 743).

On July 19, 2021, Mr. Wiseman met with Joanne Schneider, CNP, for another evaluation to assess the need for a pain rehabilitation program. (Tr. 743). There, he complained chiefly of "constant aching, burning, sharp head pain with pins and needles in the bilateral arms and legs," aggravated by cervical motion in all planes, reaching, lifting, and prolonged weightbearing and alleviated with heat, ice, and rest. (*Id.*). He rated his current pain at 6/10 and stated his pain varies from 4/10 to 9/10. (*Id.*). Mr. Wiseman endorsed emotional symptoms including sadness, depression, anxiety, frustration, irritability, anger, decreased energy, and fragmented sleep. (Tr. 745). He also reported night sweats, fatigue, vision changes, heat intolerance, excessive thirst, back pain, joint swelling and stiffness, muscle pain, memory problems, and headaches. (Tr. 746). He reported being in a reclined position for 19 hours a day, including time spent in bed. (Tr. 745). Mental status examination was normal except for mild somatic preoccupation. (Tr. 747). After reviewing prior evaluations, NP Schneider recommended participation in the Chronic Pain Neuro-Rehabilitation Program. (Tr. 748).

On July 20, 2021, Mr. Wiseman returned to the vein center where Dr. Rainey found expected post-procedural changes in the right leg, including tenderness and bruising. (Tr. 742-43). Dr. Rainey instructed Mr. Wiseman to continue using NSAIDs and compression socks and scheduled him for a right leg ambulatory phlebectomy. (Tr. 743). On July 23, 2021, Mr. Wiseman called Dr. Rainey to request more ibuprofen due to "excruciating" pain and on July 26, he went to the emergency department for increased pain to the right inner thigh. (Tr. 741). Except for an

emergency department treatment note indicating Mr. Wiseman's complaint, the administrative record is devoid of any additional information regarding this hospital visit.

## V.    MEDICAL OPINIONS

On initial consideration, dated October 26, 2020, State agency medical consultant Diane Manos, M.D., reviewed Mr. Wiseman's medical records and determined he can lift and carry 20 pounds occasionally, 10 pounds frequently; stand and/or walk and sit for six hours each in an eight-hour workday; occasionally climb ramps and stairs, stoop, and crawl; never climb ladders, ropes, or scaffolds; frequently kneel and crouch; occasionally reach overhead with the bilateral upper extremities, and must avoid all exposure to unprotected heights. (Tr. 87-89).

On reconsideration, dated March 30, 2021, State agency medical consultant Gail Mutchler, M.D., reviewed updated medical records and adopted Dr. Manos's opinion but added additional limitations, including that Mr. Wiseman can frequently balance, must avoid concentrated exposure to extreme temperatures, wetness, humidity, and noise, and must avoid all exposure to hazards such as unprotected heights and dangerous moving machinery. (Tr. 95-96).

At the administrative hearing, counsel informed the ALJ that most of Mr. Wiseman's treating providers are at the Cleveland Clinic and reported difficulty in getting those physicians to provide medical opinions because "they have to go through the legal department to fill out any forms." (Tr. 45).

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Wiseman had not engaged in substantial gainful activity since June 16, 2020, the alleged onset date. (Tr. 26). At Step Two, the ALJ determined Mr. Wiseman has several severe medically determinable impairments that significantly limit his ability

to perform basic work activities, including venous insufficiency in the right leg, cervical spondylosis and thoracic scoliosis, psoriatic arthritis, a fracture of the fifth finger of the right hand, ADD, generalized anxiety disorder, depression, and chronic pain syndrome. (*Id.*). Mr. Wiseman's history of testicular cancer, for which he had an orchiectomy, was deemed not severe. (Tr. 27).

At Step Three, the ALJ considered whether Mr. Wiseman's medically determinable impairments, alone or in combination, meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. He first noted that "[n]o treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment," and emphasized the opinion of the State Agency medical consultants who evaluated this issue and reached the same conclusion. (*Id.*).

Specifically, the ALJ determined Mr. Wiseman does not meet Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root), 1.16 (lumbar spinal stenosis resulting in compromise of cauda equina), 4.11 (chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive compulsive disorders), 12.07 (somatic symptom and related disorders), 12.11 (neurodevelopmental disorders), and 14.09 (inflammatory arthritis). (*Id.*).

Concerning the mental health impairments, the ALJ evaluated Mr. Wiseman's mental functional abilities and found mild limitation in understanding, remembering, or applying information and moderate limitation in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 28).

Before proceeding to Step Four, the ALJ assessed Mr. Wiseman's residual functional capacity and determined Mr. Wiseman can perform light work except he can frequently balance,

kneel, and crouch; occasionally stoop, crawl, and climb ramps and stairs, but never climb ropes,

ladders, or scaffolds; occasionally reach overhead with the bilateral upper extremities; must avoid

concentrated exposure to wetness, humidity, extremes of heat and cold, and must avoid all

exposure to unprotected heights, dangerous moving machinery, and commercial driving; limited to

performing simple, routine tasks that do not involve arbitration, negotiation, confrontation,

directing the work of others, or bearing responsibility for the safety or welfare of others; cannot

perform assembly line work; and limited to occasional interactions with others and a workplace in

which changes are explained in advance and gradually imposed. (Tr. 29).

In reaching this conclusion, the ALJ assessed the objective medical evidence, the effects of

treatment, reports of daily activities, recorded observations, the effects of Mr. Wiseman's alleged

symptoms, and the State agency medical consultants' opinions. (Tr. 30-34). First, he outlined Mr.

Wiseman's reported symptoms, as follows:

> The claimant reports head, neck, shoulder and hand pain, affecting his fine motor
> capabilities, and leg pain, which he attributes to saphenous vein reflux, psoriatic
> arthritis, and degenerative disc disease, and which are reported to cause deficits of
> his ability to lift, bend, stand, squat, reach, walk, sit, kneel and climb, along with
> depression and anxiety, said to cause deficits of his ability to get along with others,
> to concentrate, and react appropriately to stressors and changes.

(Tr. 30).

Regarding psoriatic arthritis, the ALJ noted Mr. Wiseman's diagnosis was consistent with

his reports of chronic pain, but the record, considered as a whole, does not support the

"contention that the existence of this impairment would be preclusive of all types of work." (Tr.

30). In support, the ALJ noted Mr. Wiseman's serology testing was not clinically significant, his

skin biopsy was non-diagnostic, methotrexate controlled the impairment, and clinical

examinations were largely "mildly adverse, or benign." (*Id.*). Of a July 14, 2020, appointment with

19

Mr. Wiseman's rheumatologist, the ALJ noted "no swelling or erythema of the hand, face, or viewable joints, no lesions, rashes or ulcers of the hands and viewable joints." (*Id*.). Regarding rheumatology appointments in May and July 2021, the ALJ emphasized "tenderness of the fingers without synovitis or deformity, with full range of motion, good strength, normal gait and intact sensory function," and "normal muscle strength and tone, normal sensory function, clearly exaggerated reflexes, with normal gait and coordination," respectively. (*Id*.).

Next, the ALJ considered Mr. Wiseman's history of shoulder, neck, and back pain, including the surgical placement of Harrington rods to stabilize thoracic scoliosis and his more recent diagnosis of cervical spondylosis, and concluded the findings are consistent with his allegations, but the record does not support the contention that the impairment precludes all work. (*Id*.). The ALJ emphasized thoracic spine imaging showing intact, stable hardware, stabilized scoliosis without disc herniation, no cord signal abnormality, and a patent spinal canal, and cervical spine imaging showing a bulge at the C6-C7 joint without canal or foraminal stenosis or signal cord abnormality. (*Id*.). Looking to Mr. Wiseman's treatment, the ALJ noted the good effect of medical marijuana, Cymbalta, and the cervical RFA on the right. (Tr. 30-31). The ALJ again took note of the mildly adverse and benign clinical findings, citing treatment records from August 24, 2020, and July 6, 2021, indicating "pain with cervical facet loading, and reduced lateral rotation" but otherwise normal range of motion, strength, coordination, reflexes, sensory function, and gait, and "normal strength, tone, sensory function, clearly exaggerated reflexes, normal gait and coordination," respectively. (Tr. 31).

Regarding Mr. Wiseman's venous insufficiency, the ALJ determined the sonographic examination reporting positive reflux in the greater saphenous vein and multiple superficial

varicose veins was consistent with his allegations of leg pain, but the record did not support his claim that the impairment precluded all types of work. (*Id.*). In support, the ALJ pointed to evidence of "normal deep venous system" and findings of full radial and pedal pulses, no erythema, and no fluctuance after laser therapy. (*Id.*). The ALJ acknowledged Mr. Wiseman's residual fibrotic occlusion of the greater saphenous vein and patent varicosities but noted a phlebectomy was scheduled to address these issues. (*Id.*).

The ALJ also evaluated the State agency medical consultants' opinions, finding them both mostly persuasive and adopting all limitations but Dr. Mutchler's noise-level restriction and finding more postural and environmental limitations than those stated by Dr. Das. (Tr. 33-34).

Next, the ALJ addressed Mr. Wiseman's mental impairments, ADD, generalized anxiety disorder, chronic pain syndrome, and depression disorder and determined the diagnoses are consistent with his allegations of anxiety and depression, but the record does not support the impairments precluding all types of work. (Tr. 32). In support, the ALJ emphasized the good effect of Mr. Wiseman's medications (Vyvanse and Cymbalta) and that he never sought treatment with a counselor or psychologist. (*Id.*). In addition, he pointed to a mental status examination showing generally benign findings, including mild somatic pre-occupation, good eye contact, euthymic effect, logical and relevant thought processes without delusions or hallucinations, good insight and judgment, and normal attention and concentration. (*Id.*).

Addressing Mr. Wiseman's daily activities and reported symptoms, the ALJ stated:

At one point or another in the record (either in forms completed in connection with the application or appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: the claimant is able to attend to his self-care. He is able to engage in light household cleaning, "fix-it" repairs, to prepare meals and launder clothes occasionally. He is able to drive a car, shop in stores, manage his own medications, finances and an e-mail account. He

is able to use a computer. He watches movies and listens to audiobooks for pleasure, creates art as he remains able, and keeps bees. As recently as November 2020, he was assessed as independent with all activities of daily living and intrinsic activities of daily living. In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

The following observations, recorded pursuant to Social Security Ruling 16-3p, have also informed the conclusions announced in this decision. The claimant described multiple limitations in his activities of daily living in September 2020, yet was assessed as fully independent with all activities of daily living and intrinsic activities of daily living in November 2020. The claimant stopped working due to a pandemic-related lay off. Self-report scales indicate the claimant is catastrophizing his pain. Examiners have noted clearly exaggerated responses on physical examinations, and marked somatic pre-occupation on behavioral examinations. However, an intake "screener" for the Cleveland Clinic's chronic pain recovery program noted that the claimant did not talk about his pain until asked about it. These observations are not intended to imply an intent to deceive or mislead. Clearly, since the claimant has been recommended for inclusion in the chronic pain recovery program, there is a genuine psychopathology component involved. Rather, these observations are intended to demonstrate why the objective medical evidence has been emphasized, and why the claimant's subjective allegations have been treated with the utmost care.

(Tr. 32-33).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

24

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mr. Wiseman claims the ALJ did not properly apply Social Security Ruling (SSR) 16-3p and the ALJ's residual functional capacity assessment is not supported by substantial evidence. (Pl.'s Br., ECF #7, PageID 965, 973-74). Mr. Wiseman asserts the ALJ's decision failed to include specific reasons for his findings on subjective symptom statements and that it was not supported by the evidence in the case record. (*Id.* at PageID 972). In his view, the ALJ's decision provided an insufficient analysis and fails to make his decision-making clear to individuals and subsequent reviewers such as this Court. In response, the Commissioner argues that substantial evidence supports both the ALJ's evaluation of Mr. Wiseman's subjective complaints and the residual functional capacity assessment. (Comm'r's Br., ECF #9, PageID 991, 997).

As outlined below, I agree with Mr. Wiseman. The errors in the ALJ's analysis of his subjective symptoms prevent this Court's review and render the decision not supported by substantial evidence.

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, recognizing that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence, the ALJ considers the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case. *Id.* In addition, the ALJ uses the following factors, set forth in 20 C.F.R. § 404.1529(c)(3), to evaluate the individual's statements:

1. A claimant's daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

26

The ALJ is not required to analyze all seven factors, only those germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ must explain which of an individual's symptoms are consistent or inconsistent with the evidence of record and how the ALJ's evaluation of the symptoms led to his conclusions. SSR 16-3p at *9. However, the ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds those complaints are inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The decision need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio

Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

At first glance, the ALJ's evaluation of Mr. Wiseman's symptoms appears consistent with the regulations and SSR 16-3p. In his decision, the ALJ compared Mr. Wiseman's statements about the intensity, persistence, and limiting effects of his symptoms with "the either mildly adverse, or benign findings" made on clinical examination; the effectiveness of his medications; his reported daily activities, characterized as "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations"; and emphasized treatment records where examining providers purportedly noted "exaggerated response" on examination. (*See* Tr. 30-33).

But closer inspection of the ALJ's decision reveals several errors that preclude this Court from determining whether the ALJ's conclusions are supported by substantial evidence. Most problematic is the ALJ's discussion of Mr. Wiseman's "clearly exaggerated responses on physical examinations," and the resulting (but unarticulated) inference that his pain was also an exaggerated response. (Tr. 33). In this section, the ALJ emphasized that "[e]xaminers have noted clearly exaggerated response on physical examinations" when finding Mr. Wiseman's reported symptoms inconsistent with the evidence. (Tr. 33, referring to Tr. 761) ("Reflexes were 3+ throughout and are clearly exaggerated."). From this, it appears the ALJ interpreted the clinical term "exaggerated" as synonymous with Mr. Wiseman embellishing his symptoms. In common parlance, that may be true. But in the medical context, an "exaggerated" reflex is a term of art. The National Institute of Neurological Disorders and Stroke, a part of the National Institute of Health, identifies an exaggerated reflex response as a medical term indicating spasticity, a type of hypertonia in which muscle spasms are increased by movement. National Institute of Neurological

28

Disorders and Stroke, *Hypertonia,* http://www.ninds.nih.gov/health-information/disorders/ hypertonia (last accessed November 11, 2023). "In this type, people usually have exaggerated reflex responses." *Id.* Because an exaggerated reflex is a clinical finding and not commentary on the truthfulness of the patient, the evidence does not support the ALJ's conclusion to discount Mr. Wiseman's symptoms.

In addition, it does not appear that the ALJ took a longitudinal view of Mr. Wiseman's abilities and their degeneration over time. The ALJ's decision emphasized the daily activities Mr. Wiseman endorsed in his Adult Function Report (written on October 12, 2020), including that he could perform light household cleaning, small repairs, prepare meals, launder clothes occasionally, drive a car, use a computer, shop in stores, and manage his own finances, medications, and email account. (Tr. 32). However, at the August 2021 administrative hearing, Mr. Wiseman described a far more restricted typical day: he wakes up, showers, eats breakfast, and stays off his feet for most of the day except to walk around for blood flow purposes. (Tr. 54). He specifically endorsed being fatigued, napping frequently, and elevating his legs for hours to relieve leg pain; also, he specifically stated he could no longer cook meals, do dishes, clean, do small repairs, or do laundry. (Tr. 54-55, 60). The ALJ's decision did not acknowledge the significant discrepancies between these two accounts of Mr. Wiseman's daily activities. (*See* Tr. 33). Without instruction from the ALJ resolving these discrepancies, it impossible to determine whether he discounted or overlooked this evidence. *See Shrader,* 2012 WL 5383120, at *6. Because the ALJ did not address clearly conflicting evidence, the Court cannot determine whether the ALJ's conclusions are supported by substantial evidence.

In addition, there is clear error in the ALJ's assertion that Mr. Wiseman was assessed as independent with all activities of daily living. The ALJ's decision states, "[a]s recently as November 2020, [Mr. Wiseman] was assessed as independent with all activities of daily living and intrinsic activities of daily living." (Tr. 32-33, referring to Tr. 682). Yet the cited treatment record relates solely to the post-surgical healing of Mr. Wiseman's right pinky finger. (Tr. 682).

I include a brief review of this period in the medical record: on October 27, 2020, Mr. Wiseman fractured his right fifth finger and, on October 30, he underwent an open reduction and internal fixation procedure with K-wires. (Tr. 677-78, 693). On November 11, 2020, Mr. Wiseman met with an occupational therapist for evaluation of his right hand. (Tr. 682). On intake assessment, he reported not being able to tie his shoes, type, draw, sketch, or paint, but was previously able to do "[i]ndependent ADLs without pain and [i]ndependent IADLs without pain," and had a goal to "return to full right hand use." (*Id.*). On November 19, he reported having general range of motion in the hand but was unable to tie shoes or use zippers. (Tr. 712). On December 9, 2020, Mr. Wiseman returned to the occupational therapist and reported being able to do the dishes but unable to draw, paint, and sketch. (Tr. 708).

Moreover, it appears that the ALJ's reference to Mr. Wiseman's ability to independently complete his activities of daily living is a mischaracterization of the record. The record referenced by the ALJ clearly states Mr. Wiseman was *previously* independent in daily activities using his right hand but was *currently* unable to use it. (Tr. 682). That portion of the medical record states: "Previous Functional Status: Able to do: Independent ADLs without pain and Independent IADLs without pain. Current Functional Status: Unable to do: Tying shoes, Typing and draw

sketch paint." (*Id.*) When placed in the proper context, the ALJ's conclusion that Mr. Wiseman was assessed as independent in his daily activities in November 2020 is plainly unsupported.

In light of the ALJ's failure to acknowledge evidence that conflicts with his findings and the other identified concerns, including lay interpretation of medical terms and mischaracterization of the record, I cannot conclude that substantial evidence supports the ALJ's evaluation of Mr. Wiseman's statements concerning the intensity, persistence, and limiting effects of his symptoms. Therefore, I recommend the District Court reverse the ALJ's decision and remand for further proceedings consistent with this recommendation.

Mr. Wiseman also brings a second assignment of error, arguing the ALJ's residual functional capacity assessment finding him capable of light work is not supported by substantial evidence. (ECF #7 at PageID 973-74). I do not reach this issue due to the errors found in the first assignment of error. The ALJ's residual functional capacity assessment must be based on all relevant evidence in the record, including reports of daily activities and the effects of the claimant's symptoms. *See* SSR 96-8p, 1996 WL 374184, *5. Because of the errors identified in the ALJ's evaluation of Mr. Wiseman's symptoms and daily activities, I cannot determine if the ALJ's residual functional capacity finding is supported by substantial evidence.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits.

Dated: November 13, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl,* 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.,* 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green,* No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard,* 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).